UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| Paul J. Watson, Jr., | ) | Civil Action No.: 7:03-1932-RBH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| Mrs. Smith's Bakery of Spartanburg, LLC; | ) | |
| John Doe Corp.; Flowers Foods, Inc.; and | ) | |
| Schwan Food Company, d/b/a Schwan's | ) | |
| Bakery Operations, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

In this matter, the plaintiff, Paul J. Watson, Jr. ("Watson"), alleges racial discrimination in violation of Title VII of the Civil Rights Act of 1964, breach of contract, and breach of contract accompanied by a fraudulent act. Plaintiff filed this case on June 10, 2003. Defendants filed a motion for summary judgment on June 16, 2004. Plaintiff filed a response on September 27, 2004.

This matter is now before the undersigned for review of the Report and Recommendation ("the Report") filed by United States Magistrate Judge William M. Catoe, to whom this case had previously been assigned pursuant to 28 U.S.C. § 636(b)(1)(A) and Local Rule 73.02(B)(2)(g). In his Report, Magistrate Judge Catoe carefully considers these issues and recommends that the defendants' motion for summary judgment be granted as to plaintiff's federal claims and the remaining state law claims be dismissed for lack of jurisdiction pursuant to 28 U.S.C. § 1367(c)(3). Plaintiff filed objections to the Report on January 21, 2005. Defendants filed a response to plaintiff's objections on February 14, 2005.

In his objections the plaintiff alleges that the Report's finding that the defendant is entitled to

1

summary judgment is in error.  The plaintiff alleges that the Magistrate Judge has "misapprehended the nature of Watson's Title VII claim, misapplied the standard of review, and ignored crucial parts of the large mass of evidence Watson presented."  (Pl. Obj. p. 1.)

In conducting this review, the Court applies the following standard:

> The magistrate judge makes only a recommendation to the Court, to which any party may file written objections . . . . The Court is not bound by the recommendation of the magistrate judge but, instead, retains responsibility for the final determination.  The Court is required to make a *de novo* determination of those portions of the report or specified findings or recommendation as to which an objection is made.  However, the Court is not required to review, under a *de novo* or any other standard, the factual report and recommendation to which no objections are addressed.  While the level of scrutiny entailed by the Court's review of the Report thus depends on whether or not objections have been filed, in either case, the Court is free, after review, to accept, reject, or modify any of the magistrate judge's findings or recommendations.

*Wallace v. Housing Auth. of the City of Columbia*, 791 F. Supp. 137, 138 (D.S.C. 1992) (citations omitted).

### Summary Judgment Standard

Defendants filed their motion for summary judgment pursuant to Rule 56, FRCP.  The moving party bears the burden of showing that summary judgment is proper.  Summary Judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Rules 56(c), FRCP; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof.   *Celotex*, 477 U.S. 317.  Once the moving party has brought into question whether there is a genuine issue for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  The non-moving party must come forward with enough evidence,

beyond a mere scintilla, upon which the fact finder could reasonably find for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Barber v. Hosp. Corp. of Am.*, 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at trial on the merits." *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).

### Facts

One of the plaintiff's objections[1] is that is that the Magistrate Judge "ignored crucial parts of the large mass of evidence Watson presented." This Court has reviewed the evidence presented by both parties, including the affidavits of Wendy Butler, Dina Gerrish, Micky McNiell, and Paul Watson, which were filed separately from plaintiff's memorandum in opposition to the motion for summary judgment. As this is defendants' motion for summary judgment, the Court will present the facts in the light most favorable to the plaintiff as the non-moving party.

The defendants[2] are in the wholesale bakery business and produce a variety of cakes and pies. The plaintiff, a Native American Lumbee Indian, was hired by Mrs. Smith's as a Production Planner at its Pembroke, North Carolina plant in November of 1997. Watson was promoted to Plant Superintendent, or First Shift Production Manager, on June 18, 1999. Mrs. Smith's closed the

---

[1] While plaintiff's counsel is certainly entitled and encouraged to state any appropriate objections to the Magistrate Judge's Report and Recommendation, counsel's personnel negative remarks concerning one of this district's most experienced and respected United States Magistrate Judges is inappropriate. *See* Plaintiff's Objections fn. 7.

[2] Each of the defendants is a separate corporate entity. Flowers Foods, Inc., was the ultimate parent company of Mrs. Smith's Bakery. Schwan Food Company purchased Mrs. Smith's Bakery from Flowers.

3

Pembroke plant in December 2001 and many of the Pembroke employees, including the plaintiff, were transferred to Mrs. Smith's Spartanburg, South Carolina plant, a pie manufacturing facility.  At the Spartanburg facility plaintiff assumed the duties of First Shift Production Manager and received a fifteen percent (15%) salary increase.

Watson states that soon after his arrival at the Spartanburg facility he began to notice problems. Plaintiff alleges that David Stanaland, the Plant President (also referred to as the Plant Supervisor, Plaint Manager and/or General Manager) "was a micro-manager with a reputation among employees who worked at Mrs. Smith's Spartanburg facility of being a racist, being abusive towards minority employees, and treating minority employees less favorably than their Caucasian counterparts."  (Pl. Memo. in Opposition to Motion for Summary Judgment p. 3.) Plaintiff alleges that Stanaland treated minority employees less favorably then their Caucasian counterparts and made racially derogatory remarks about black and Hispanic employees.

The first incident at issue in this case occurred in March of 2002.  At that time, a large number of pies had to be discarded after quality control testing disclosed an unacceptably high micro-biological contamination of the product.  The product had to be destroyed, resulting in a cost of $65,000 and eight (8) hours of lost production time.  After an investigation, on April 15, 2002, the plaintiff received "Documented Counseling" regarding his role in the incident.  At that time, plaintiff was admonished to use

> more participative management and include those employees around you in the decision making process.  Equally important, you are to inform your supervisor of these types of decisions prior to implementing them. . . . As a key member of our management team, you are responsible to provide the necessary leadership and to support and adhere to all Company policies and procedures.

The plaintiff denies that he was responsible for the contamination of the product or the resulting loss. While he admits that he authorized the use of the crème base in fillings (which are generally heated thus

4

eliminating any micro-biological issue) in accordance with the instructions of his supervisor Danny Banks, following consultation with more experienced employees, he alleges that he did not authorize use of the crème base in toppings (which are not heated). Watson is of the opinion that he was unfairly targeted as a scapegoat with regard to the crème base incident. This opinion is based in part upon a conversation Watson had with Jimmy Jackson, the other production manager working with Watson and a Caucasian. Plaintiff alleges that Jackson admitted he was guilty of a prior incident directing that tainted crème base be used in production which resulted in pies having to be discarded, but that Jackson was never counseled.

In April 2002, Purchasing Manager Tina Oxendine resigned on short notice. Plaintiff was asked to move into the Purchasing Manager position. The plaintiff's salary and benefits remained the same and the defendants allege that the move was not a promotion. Plaintiff, on the other hand, alleges that the move was a promotion and that he was promised a later increase in salary by Banks. After the reassignment, Watson requested additional staff and was granted two additional positions. After a month in the position, Watson was transferred back to First Shift Production Manager. Tina Oxendine, also a Lumbee Indian, returned to employment with the defendant as Purchasing Manager shortly thereafter. Watson alleges that, at the same time he was transferred, "every other minority employee" was also transferred, but none of the Caucasian employees were transferred.

While he was Purchasing Manager, Watson was accused of sexual harassment, violating company policy, by one of the female employees. Watson alleges that he denied any improper conduct on his part, but he did admit that he had touched his employees on their shoulders or arms. On May 15, 2002, the plaintiff was issued a "Letter of Final Warning" with the following admonition:

> Violation of the Policy Against Harassment is so serious that it normally results in discharge without prior warning. However, in lieu of termination, you are receiving this notice as a Letter of Final Warning. The purpose of this documentation is to put you

on notice that a violation of this nature in the future will result in the appropriate discipline, up to and including termination.

Plaintiff alleges that the letter issued was not an appropriate measured response to the allegations because he says he did not commit any offense.

Several months after the plaintiff resumed his duties as a Production Manager, on June 17, 2002, a bolt or pin was sheared off a piece of carriage assembly equipment on the crème pie line, necessitating repair. Banks, plaintiff's supervisor, alleges that he instructed the plaintiff to have the engineer shut down production and to put plastic and paper down to cover the equipment and to protect the product zone. The plaintiff alleges that Banks told him to put down plastic, but said nothing about paper. Plaintiff alleges that he obtained the plastic as instructed, but that the repairman indicated that standing on plastic would pose a serious risk of falling and suggested spreading cardboard instead. Watson states that he agreed with the repairman, but that before he could put the cardboard in place, Banks accused Watson of insubordination and, without permitting Watson to explain, directed him to leave the plant, stating that he would contact Watson within the next few days. Banks states that when he learned that the plaintiff ignored his instructions, he suspended him, pending investigation, for insubordination because he failed to follow Banks' direct order. Defendants allege that on June 19, Banks called the plaintiff and asked him to return to the plant to discuss the events of June 17, but that plaintiff refused. Banks states that he wrote a follow-up letter asking the plaintiff to contact him to schedule a meeting and notifying him that if he did not do so by 4:30 p.m. on June 24, that the defendant would consider the plaintiff to have voluntarily resigned. Plaintiff alleges that no one from Mrs. Smith's, including Banks, ever contacted him.

Plaintiff alleges that he wrote to an upper-level management employee with Mrs. Smith's complaining of what he perceived to be unfair treatment he experienced in the Spartanburg facility.

6

Rick Yestrumsky, the Director of Human Resources for the Mrs. Smith's Division of Flowers Foods contacted Watson, requesting that he return to Spartanburg to participate in an investigation into the incident at issue.  Watson refused because he believed that "he would not obtain a fair or reasonable investigation of the situation.  Watson did eventually agree to meet with Yestrumsky.  After the meeting, Yestrumsky relayed the information Watson provided to upper level management employees of Mrs. Smith's at the Spartanburg facility, but he did not undertake or direct to be undertaken any independent investigation.  The following week, Yestrumsky telephoned Watson and told him that Mrs. Smith would accept Watson's voluntary resignation.

### Title VII

The Magistrate Judge recommended that this Court grant summary judgment in favor of defendants on plaintiff's Title VII claim and dismiss the remaining state-law causes action without prejudice so that those claims may be pursued in state court.  Consequently, this Court will first deal with plaintiff's Title VII claim.

Title VII provides:

> It shall be unlawful employment practice for an employer–(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1).  Plaintiff alleges

> that his rights under Title VII were violated by Mrs. Smith's illegal racial animus in disciplining him in connection with the crème base incident, disciplining him for sexual harassment, and transferring him out of the position of Purchasing Manager.  Watson also maintains that these events, as well as others that he and other Mrs. Smith's employees have identified, collectively created a racially hostile work environment violative of Title VII.  Finally, Watson asserts that he was constructively discharged from his position at the Spartanburg facility on account of his race.

(Pl's Memo in Opposition to Motion for Summary Judgment, pp. 11-12.)  Both in his memorandum

in opposition to the motion for summary judgment and in his objections, the plaintiff largely cites facts with little discussion of how the law relates to them. Additionally, it is unclear to this Court whether the plaintiff is proceeding under the *McDonnell Douglas* (single motive) or the *Price Waterhouse* (mixed motive) analysis. The defendants and the Magistrate Judge used the *McDonnell Douglas* analysis, and plaintiff does not address the analysis used in his objections. Since the plaintiff does not object to the Magistrate Judge's use of the *McDonnell Douglas* analysis, that is the analysis that this Court will use.[3] The plaintiff does suggest that rather on focusing on each individual event, the Court should look at the situation as a whole.

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the United States Supreme Court devised an allocation of proof scheme, which permits the use of circumstantial evidence to prove individual disparate treatment. Under this analysis, the plaintiff has the initial burden of demonstrating a *prima facie* case of discrimination. If the plaintiff is able to establish a *prima facie* case, the burden shifts to the defendants to produce a legitimate, nondiscriminatory reason for the termination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). This is a burden of production, not one of persuasion. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993). Once the defendant produces a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to demonstrate

---

[3] The Fourth Circuit recently stated:

> We have long held that "the [Federal Magistrates] Act can[not] be interpreted to permit a party . . . to ignore his right to file objections with the district court without imperiling his right to raise the objections in the circuit court of appeals." *United States v. Schrone*, 727 F.2d 91, 93-94 (4th Cir. 1984); *see also Page v. Lee*, 337 F.3d 411, 416 n.3 (4th Cir. 2003). The Supreme Court has expressly upheld the validity of such a waiver rule, explaining that "[t]he filing of objections to a magistrate's report enables the district judge to focus attention on those issues – factual and legal – that are at the heart of the parties' dispute." *Thomas v. Arn*, 474 U.S. 140, 147 (1985). Absent such a rule, litigants would have little incentive to object in the district court, *Wells* [*v. Shriners Hosp.*,] 109 F.3d [198,] 200 [(4th Cir. 1997)], and "any issue before the magistrate would be a proper subject of judicial review," *Thomas*, 474 U.S. at 148. The Magistrates Act does not contemplate such an obviously inefficient use of judicial resources: "Congress would not have wanted district judges to devote time to reviewing magistrate's reports except to the extent that such review is requested by the parties or otherwise necessitated by Article III of the Constitution." *Id*. at 153.

by a preponderance of the evidence that the legitimate reason produced by the defendants is not the true reason for termination, but pretext for discrimination. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000). In making this analysis, it is not necessary to decide "whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination."[4] *Hawkins v. Pepsico*, 203 F.3d 274, 279 (4th Cir. 2000). It is the perception of the employer, not the employee, that is critical. *Hawkins*, 203 F.3d at 280. A reasoned decision, even if based on incorrect facts, is not evidence of pretext. *Pollard v. Rea Magnet Wire Co.*, 824 F3d 557, 559 (7th Cir. 1987).

## Demotion

To establish a *prima facie* case on his demotion charge, plaintiff must show that (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) other employees who are not members of the protected class were treated differently. *Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 133 (4th Cir. 2002). The defendants do not contest that Watson is a member of a protected class. They do, however, contend that they did not demote Watson and that any reprimands he received were not adverse employment actions.

The Supreme Court has described an adverse employment action as one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indust., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). Conduct short of "ultimate employment decisions–to hire, discharge, refuse to promote, etc.–can constitute an adverse employment action under

---

[4] "Proof that the employer's proffered reasons is unpersuasive, or even obviously contrived, . . . does not necessarily establish that [plaintiff's] proffered reason . . . is correct." *Reeves*, 530 U.S. at 146-47. "It is not enough to disbelieve the [employer]." *Love-Lane v. Martin*, 355 F.3d 766, 788 (4th Cir. 2004). Plaintiff must show a reasonable jury could "believe [his] explanation of intentional . . . discrimination." *Id*.

Title VII." *Von Gunten v. Maryland*, 243 F.2d 838, 865 (4th Cir. 2001). Retaliatory harassment also can constitute an adverse employment action. *Id*. A plaintiff must establish that the challenged discriminatory acts of harassment adversely affected "the terms, conditions, or benefits" of his employment. *Id*. Additionally, plaintiff must show that the change was significant. *See Von Gunten*, 243 F.3d at 868. *See generally Burlington Indust., Inc. v. Ellerth*, 254 U.S. 742 (1998); *Crady v. Liberty Nat. Bank & Trust Co. Of Ind.*, 933 F.3d 132, 136 (7th Cir. 1993). The question for this Court, then, is whether the plaintiff's alleged "demotion" constitutes an adverse employment action.

Plaintiff claims that his move from the purchasing department back to his initial production manager position was a demotion. Defendants argue that plaintiff's transfer to purchasing was never considered a promotion, but rather a lateral transfer. Defendants argue that plaintiff's move into purchasing was only temporary, implemented because the prior purchasing manager resigned on short notice and they needed someone to fill the position for a short time. Plaintiff contends, however, that the move to the Purchasing Manager Position was a promotion because Danny Banks had told him that it would be a "huge opportunity." Plaintiff also contends that Banks promised him an increase in salary as a result of the new position. However, there is no disagreement that no increase in salary had yet resulted from the transfer, even after the plaintiff served in his new capacity for several weeks.

"[A]bsent any decrease in compensation, job title, level of responsibility or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004) (*citing Boone v. Goldin*, 178 F.3d 253, 257-58 (4th Cir. 1999)). Plaintiff attempts to allege a decrease in salary. However, the plaintiff never received an increase in salary. He had at most, the promise of a potential increase in salary. There is no evidence in the record to establish when that salary increase was to take place or in what amount. Furthermore, it is entirely possible that the

10

plaintiff could have received a salary increase in the production manager position as well. The Court finds the promise of an increase in salary too abstract for the plaintiff to establish a demotion.

The plaintiff also argues there was a decrease in the level of his responsibility and, therefore, there was an adverse employment action. Even assuming that this statement is true and the plaintiff can establish the adverse employment element of a *prima facie* case, the plaintiff must still establish that other employees who are not members of the protected class were treated differently. *Bryant*, 288 F.3d at 133. In order to show that other employees were similarly situated the plaintiff must show that they are similar in all relevant respects. *Heyward v. Monroe*, 166 F.3d 332 (4th Cir. 1998) (unpublished). This means that "the employees 'dealt with the same supervisor, [were] subject to the standards and . . . engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id.*, citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1982); *see also Arambru v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997). The plaintiff has failed to allege a comparator to support his demotion claim.    In his memorandum in opposition to the  motion for summary judgment, the plaintiff states that "none of the Caucasian employees was transferred." (At p. 6.) However, the plaintiff does not sufficiently identify these individuals so that the Court can evaluate whether they are in fact proper comparators.

The plaintiff also objects to the Magistrate Judge's statement that

> the fact that Stanaland and Banks were the decisionmakers responsible both for recommending the plaintiff for the Purchasing Manager position *and* for moving him back to Production Manager position only one month later creates a "strong inference . . . that discrimination was not a determining factor" in the decision. *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991). *See also Tyndall v. National Education Centers, Inc.*, 31 F.3d 209, 215 (4th Cir. 1994).

(Report p. 10.) *Proud* stands for the proposition that an adverse employment decision made by the same individual who recently conferred the employment benefit is unlikely to be motivated by

discrimination.[5]  The plaintiff objects to the application of this principle because "Stanaland had no choice but to give Watson the position due to the lack of other candidates and immediate need to have the vacancy filled." (Objections pp. 7-8.)   The plaintiff acknowledges in his objections that, as Plant Manager, Stanaland had the ultimate authority over all positions, including the decision to transfer Watson into the position of Plant Purchasing Manager. (*See* Objections p. 5.) Consequently, this Court finds that the Magistrate Judge correctly determined that Stanaland was the individual who decided to transfer Watson to Plant Manager as well as the individual who decided to transfer him back to Production Manager.  Consequently, this Court agrees with the Magistrate Judge that, even assuming plaintiff can establish an adverse employment action, which the Court has not so found, defendants are entitled to an inference that discrimination was not a motivating factor in the transfer.

**Reprimands**

Plaintiff also alleges that the defendants improperly reprimanded him on two occasions, the crème base incident and the sexual harassment complaint against him, because of his race.  For a *prima facie* case of disparate disciplinary practices, the plaintiff must establish (1) that he is a member of a protected class; (2) that the prohibited conduct in which the plaintiff engaged was as serious as the misconduct of employees outside the protected class; and (3) the employer imposed harsher disciplinary measures against the plaintiff than against employees outside the protected class. *See Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993).

**Crème Base Incident**

As discussed above, plaintiff received a written reprimand following an incident involving the

---

[5] The Fourth Circuit specifically stated "in cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer."  *Proud*, 945 F.2d at 797.

use of crème base which had micro-biological contamination and resulted in the loss of $65,000 worth of product and eight (8) hours of production. The plaintiff alleges that "Watson was at a minimum no more culpable tha[n] other supervisors, who were white. Banks initially instructed that the creme base at issue should be used in pie filling but not pie topping." (Objections p. 10.) Watson's testimony is that he instructed the crème base be used only in "hot fill" pies and that he was not informed that Banks had instructed that the crème base be destroyed rather than used in "hot fill" pies as previously instructed. Consequently, plaintiff alleges that he is no more responsible that crème base was used in cold fill pies than Banks or any other production manager.

The defendants point out that plaintiff was, at least temporarily, transferred to the purchasing department shortly after his write-up for the crème base incident. Additionally, he failed to appeal the accuracy of this write-up, despite the fact that he has acknowledged that the Company had in place an appeal process. Defendants also argue that they had a sound factual basis for the reprimand. They state that their investigation revealed that Watson specifically ordered the use of crème base in the pie fillings, despite other employees raising questions about the crème base in question. (*See* Jennings Dep. p. 64 and Exhibit 14, pp. 11-18.)

"The most important variables in the disciplinary context, and the most likely sources of different but nondiscriminatory treatment, are the nature of the offenses committed and the nature of the punishments imposed." *Burwell v. Philip Morris, Inc.*, 43 F.3d 1465 (4th Cir. 1994) (unpublished) (*quoting Moore v. City of Charlotte, N.C.*, 754 F.2d 1100, 1105 (4th Cir.)

The plaintiff attempts to use Jimmy Jackson as a comparator. He alleges that Jackson, a white male, caused Mrs. Smith's to lose $30,000 worth of product as a result of using the wrong crème base, but received no formal write-up in his file. (Watson Dep. pp. 66-67.) Plaintiff has no personal

knowledge of this contention, claims he is only repeating what Jackson told him.[6]    No affidavit or deposition of Jackson has been submitted to the Court by the plaintiff.  The plaintiff does provides the affidavit of Mickey McNeill stating that he "witnessed a difference in the disciplinary treatment Watson, a Lumbee Indian, received compared to production supervisor Jimmy Jackson, a Caucasian, with respect to a virtually identical incident."  (McNeill Af. p. 2.)  Jennings could not recall any incident with Jackson and does not have any investigatory records indicating that Jackson caused similar problems.  (Jennings Dep. pp. 87-89.)  As an initial matter, plaintiff's testimony regarding what Jackson told him is not admissible.  *See* footnote 5 above.  However, even assuming that the information submitted by Watson is true and admissible, Jackson is not a proper comparator.

The plaintiff must establish that Jackson was similarly situated in all relevant respects; that they "dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000); *Stanback v. Best Diversified Products, Inc.*, 180 F.3d 903, 910 (8th Cir. 1999); *Shumway v. United Parcel Serv., Inc.*, 188 F.3d 60, 64 (2d Cir. 1997).  "[T]he relevant comparison should not center around similarly situated employees, rather, the court should compare offenses which are comparable in seriousness to the plaintiff's misconduct. The focus is on similar offenses, not similar employees." *Burwell*, *supra*.  The plaintiff alleges that he and

---

[6] The plaintiff argues that Jackson's statement is admissible as the admission by a party-opponent exception to the hearsay rule under Federal Rule of Evidence 801(d)(2)(D). (The plaintiff cites Rule 801(c)(2)(D), but the Court believes that citation was an oversight by plaintiff's counsel.)  Rule 801(d)(2)(D) provides that a statement is not hearsay if–
>    The statement is offered against a party and is . . .  (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.
As pointed out by the defendant, it appears that the statement made by Jackson was not made by Jackson in  the course of performing his job or within the scope of the agency on behalf of his employer, but rather as one employee to another.

Jackson worked for the same supervisor and engaged in the same conduct.[7] Even so, plaintiff does not dispute that the amount of financial loss attributable to him was more than double that allegedly caused by Jackson (i.e., $65,000 vs. $30,000). To be a proper comparator, the misconduct must be comparable in seriousness. The Court finds that this vast difference in amount of damage resulting from the two incidents is such that they are not comparable and, therefore, Jackson is not a proper comparator.

Plaintiff states in his objections that Jackson and Banks are "white supervisors who were at least equally as culpable as Watson with respect to this incident, but received no discipline." (Objections p. 11.) The Court notes as an initial matter that the plaintiff received a Documented Counseling write-up and regarding the crème base incident and signed that document which explained why he was being held responsible for the incident. (Jennings Depo. Exh. 14.) There is no evidence in the record that at the time the write-up was signed, the plaintiff contested that he was at fault or attempted to shift the blame to others, as he now attempts to do. As discussed above, in order to be a proper comparator an individual must work for the same supervisor. Banks was the plaintiff's supervisor at the time the crème base incident occurred and reported to Stanaland while Watson reported to Banks. Since Banks and Watson did not report to the same supervisor Banks is an improper comparator. As to whether Jackson is a proper comparator, it is unclear to the Court what the plaintiff's allegations are as to how Jackson was responsible for the incident. In his objections the plaintiff states: "Jimmy Jackson, who

---

[7] In support of his allegation the plaintiff provides the affidavit of Mickey McNeill, a former Production Supervisor who worked with Watson at Mrs. Smith's in Pembroke, North Carolina and Spartanburg, South Carolina. This affidavit makes the blanket allegation that the incidents were identical, but does not provide the Court with sufficient information to make that conclusion for itself:

> I also witnessed a difference in the disciplinary treatment Watson, a Lumbee Indian, received compared to production supervisor Jimmy Jackson, a Caucasian, with respect to virtually identical incident[s]. On both occasions, Watson and Jackson were, as supervisors, responsible for use of a crème base in production. On each occasion, the crème base had spoiled, so the product produced with the base had to be destroyed. Jackson received no discipline; Watson received a write-up. This difference in treatment was significant because of the consequences a written disciplinary action carried under the applicable progressive discipline policy.

McNeil Aff. par. 7.

was white, agree with Watson that using the creme base in hot fill pies was 'acceptable because the heat of the hot-fill process would act as a kill step.'" (Objections p. 10.) Plaintiff has presented this Court with no evidence as to any similar conduct of Jackson with regard to the crème base incident in March of 2002. Consequently, plaintiff fails to establish a *prima facie* case.

**Sexual Harassment Complaint**

Plaintiff also challenges the "Letter of Final Warning" issued on May 15, 2002, regarding a sexual harassment complaint made against him. Watson takes the position that the Magistrate Judge improperly states the plaintiff's position on the sexual harassment issue. Plaintiff states that he adamantly denied any improper touching, although he did admit that he touched his employees. This is exactly what the Magistrate Judge stated in his Report: " The plaintiff did not deny touching these women; he admitted that he routinely touched his employees on their shoulders or arms. However, he denied that his intent was sexual or otherwise inappropriate." (Report p. 12.) Watson's objections center on his argument that there was lack of evidence to support a finding that he violated the Company's Sexual Harassment Policy.

Plaintiff was reprimanded because of an allegation made by two female employees that he improperly touched them. Defendants state that they investigated the matter by interviewing the plaintiff as well as the two female employees. The defendants state that they have a "zero-tolerance sexual harassment policy" because they are aware of many cases where companies have had to defend lawsuits brought on the basis of improper touching.[8] The plaintiff appears to be missing the point of

---

[8] The Handbook states:

> This policy specifically prohibits sexual harassment of any kind by anyone connected with your employment, whether at work or elsewhere, such as Company functions. For purposes of this policy, "sexual harassment" means sexual advances, request for sexual favors, and verbal or physical conduct of a sexual nature when:
>
> a.    *Submission to or reject of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for an employment decision; or,*

a sexual harassment policy.  His intent in touching other employees is irrelevant, rather it is how that

touch is perceived by other employees that is relevant.  The plaintiff has failed to identify for the Court

a similarly situated employee being disciplined for similar conduct.  Plaintiff tries to get around this

requirement of a *prima facie* case by stating

> that inasmuch as he did not engage in ANY conduct prohibited [by] the Sexual
> Harassment Policy, imposing a requirement that he identify someone outside the
> protected class who also did not engage in a violation of the Sexual Harassment Policy
> and who received some punishment less than a final written warning does not make
> much sense.

(Objections p. 13.)  The fact remains that plaintiff has failed to present *prima facie* proof of disparate

disciplinary practices and has failed to provide any case law to support his position that he should not

be required to do so.

## Hostile Work Environment and Constructive Discharge

Plaintiff alleges that the defendants engaged in a variety of conduct, including his transfer and

the two reprimands, that created a racially hostile work environment and resulted in his constructive

discharge.  The plaintiff objects to the Magistrate Judge's statement that "Watson 'produced no

evidence that his transfer or reprimand were motivated by race' and that the other racially hostile

comments and discriminatory action with respect to discipline by Stanaland about which Watson

offered evidence were directed at minorities or races other than Watson's race of Lumbee Indian."

(Objections p. 17.)

---

> b.    such advances, requests or conduct have the purpose or effect of unreasonably
> interfering with an individual's work performance by creating an intimidating, hostile,
> humiliating or sexually offensive work environment.
>
> This definition of sexual harassment is broad. . . . In addition to the above examples, other
> sexually oriented conduct, whether it is intended or not, that is unwelcome and has the effect of creating
> a work place environment that is hostile, offensive, intimidating, or humiliating to male or female workers
> may also be sexual harassment.
>
> Memorandum in support of motion for summary judgment, Ex. C, p. 22 (emphasis in original).

**Hostile Work Environment**

To state a claim for a racially hostile work environment, a plaintiff must demonstrate: (1) that the harassment was unwelcome; (2) that the harassment was based on his race; (3) that the harassment was sufficiently severe or pervasive as to alter the conditions of employment and create an abusive atmosphere; and (4) that there is some basis for imposing liability on the employer. *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998).

As evidence that Stanaland's conduct was motivated by animosity toward "non-white" employees, the plaintiff maintains that Stanaland used racial slurs and administered the disciplinary policy in a racially discriminatory fashion. Plaintiff further provides a list of events that he claims satisfy the severity and pervasiveness requirement of a hostile work environment claim, such as the transfer and reprimands he received and his own belief that non-white employees were not paid as much as their white counterparts.[9] Plaintiff refers to occasions in which a supervisor allegedly made disparaging remarks about Hispanic employees and a homosexual employee. Additionally, plaintiff states that he was instructed by his supervisor to administer discipline to African-American employees that the plaintiff himself considered too severe. Plaintiff attempts to use the testimony he presents to establish that the supervisor in question had a "reputation" of being a racist.

The incidents alleged by the plaintiff do not rise to the level of severe or pervasive race-based activity necessary to state a hostile work environment claim. *See Bass v. E.I. DuPont de Nemours, Inc.*, 324 F.3d 761, 765 (4th Cir. 2003). In considering the standard of proof necessary in hostile environment cases the Supreme Court has stated:

---

[9] In support of this position the plaintiff cites the deposition testimony of Richard Yestrumsky. However, a review of that testimony seems to indicate that, while the two minority production managers were the lowest paid of the production managers "it does not take into consideration where they were at the pay level at their facility before moving into a different company, going into a different pay structure. (Yestrumsky Depo. pp. 106-124.)

> Workplace conduct is not measured in isolation; instead, whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. . . simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.

*Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001). *See also Hartsell v. Duplex Products, Inc.*, 123 F.3d 766, 772 (4th Cir. 1997). "Retaliatory harassment can constitute adverse employment action, but only if such harassment adversely affects the terms, conditions, or benefits of her employment." *Von Gunten v. Maryland*, 243 F.3d 858, 870-71 (4th Cir. 2001) (internal citations and quotations omitted).

Plaintiff does not allege a single discriminatory comment made toward him, nor any discriminatory comment made about Lumbee Indians generally, and fails to provide this Court with any law sufficient to establish that an employer's alleged derogatory marks about one race can be transferred to establish discrimination against another race. This Court finds that the Magistrate Judge correctly concluded that the collection of anecdotes and opinion testimony presented by the plaintiff, with regard to African-American and Hispanic employees, falls short of establishing severe and pervasive racial harassment.

**Constructive Discharge**

With a claim of constructive discharge, a plaintiff must establish: (1) the deliberateness of the defendant's actions, motivated by racial bias, and (2) the objective intolerability of the working conditions. *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3 180, 187 (4th Cir. 2004). In his objections, the plaintiff states:

> [T]hese events created a work environment that was so intolerable that any reasonable person would have resigned. Based upon Watson's experience over his short tenure at the Spartanburg facility, Watson had been unfairly disciplined twice, demoted without

19

> explanation once, and suspended for conduct that was not only not insubordination but which would have subjected him to discipline had he failed to take it, without even being permitted to explain himself.  Since any rational person would have concluded that they stood no chance that an explanation exonerating them would be accepted, it was a foregone conclusion that Watson was going to be unfairly terminated if he participated in an investigation.  No rational person would subject themselves to the humiliation and embarrassment of explaining their actions when it was a foregone conclusion that the outcome of the "investigation" was termination.

(Objections p. 19.)

The intolerability of working conditions is viewed by the objective standard of "whether a 'reasonable person' in the employee's position would have felt compelled to resign.  *Munday v. Waste Management of North America, Inc.*, 126 F.3d 239, 244 (4th Cir. 1997).  "An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers.  He is not, however, guaranteed a working environment free of stress."  *Id*.  A demotion can constitute constructive discharge "especially where the demotion is essentially a career-ending action or a harbinger of dismissal."  *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 378 (4th Cir. 2004).  However,

> a mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.  Even a slight decrease in pay coupled with some loss of supervisory responsibilities, is insufficient evidence of constructive discharge.

*Id*. (internal citations and quotations omitted).

As discussed above, the plaintiff has presented insufficient evidence that the defendant's actions were motivated by racial bias.  Even if the plaintiff could establish racial bias, his evidence does not support a finding that his work conditions were objectively intolerable.  Instead, it appears to the Court that he was dissatisfied with his transfer, felt unfairly disciplined or reprimanded, and was offended by Stanaland's conduct towards other employees.  These circumstances fail to establish objectively intolerable working conditions sufficient to establish constructive discharge.

20

In conclusion, the Court has reviewed these matters, both as to the individual events alleged and the record as a whole, and in both the plaintiff fails to establish a *prima facie* case of racially discriminatory conduct by his employer.

## State Law Claims

The plaintiff has also brought the state law claims of breach of contract and breach of contract accompanied by a fraudulent act against the defendants.  Since this Court has determined that the defendants' summary judgment motion should be granted on the plaintiff's federal law claim, this Court declines to exercise supplemental jurisdiction over the plaintiff's remaining state law claims. *See* 28 U.S.C. § 1367(c).

## Conclusion

I find as a matter of law that there are no genuine issues of material fact and defendants are entitled to summary judgment on plaintiff's federal law claims as a matter of law.  For the foregoing reasons, the undersigned overrules all objections, adopts the Report and Recommendation of the Magistrate Judge, incorporates it herein by reference, and **GRANTS** the defendants' motion for summary judgment as to plaintiff's federal causes of action.  This Court declines to exercise supplemental jurisdiction over plaintiff's state law causes of action and they are, therefore, dismissed *without prejudice* pursuant to 28 U.S.C. § 1367(c)(3).

**AND IT IS SO ORDERED.**

s/ R. Bryan Harwell
R. Bryan Harwell
United States District Court Judge

September 7, 2005
Florence, South Carolina

21